IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SYLVIA C., | CV 21-08-M-KLD |
| Plaintiff, | |
| vs. | ORDER |
| KILOLO KIJAKAZI, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff brings this action under 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security denying her application for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq., 1381 et seq.

I.   **Procedural Background**

Plaintiff protectively filed applications for Title II disability insurance benefits in September 2017, and for Title XVI supplemental security income in November 2017, alleging disability since September 8, 2017 based on physical and mental impairments. (Doc. 10, at 443-451). Plaintiff's claim was denied initially and on reconsideration, and by an ALJ after an administrative hearing. (Doc. 10, at 99-125, 260, 302, 332, 362). The Appeals Council denied Plaintiff's request for review, thereby making the ALJ's decision dated April 22, 2020, the agency's final

decision for purposes of judicial review. (Doc. 10, at 11-16). Jurisdiction vests with this Court pursuant to 42 U.S.C. § 405(g).

## II.   <u>Legal Standards</u>

### A.   **Standard of Review**

42 U.S.C. § 405(g) provides a limited waiver of sovereign immunity, allowing for judicial review of social security benefit determinations after a final decision of the Commissioner made after a hearing. See *Treichler v. Commissioner of Social Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). A court may set aside the Commissioner's decision "only if it is not supported by substantial evidence or is based on legal error." *Treichler*, 775 F.3d at 1098 (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Widmark v. Barnhart,* 454 F.3d 1063, 1070 (9th Cir. 2006). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). "Where evidence is susceptible for more than one rational interpretation," the court must uphold the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti v.*

*Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)).

**B.     Disability Determination**

To qualify for disability benefits under the Social Security Act, a claimant bears the burden of proving that (1) she suffers from a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of twelve months or more; and (2) the impairment renders the claimant incapable of performing past relevant work or any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A). See also *Batson v. Commissioner of Soc. Sec. Admin.*, 359 F.3d 1190, 1193-94 (9th Cir. 2004).

In determining whether a claimant is disabled, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520 and 416.920. If a claimant is found to be "disabled" or "not disabled" at any step, the ALJ need not proceed further. *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005). The claimant bears the burden of establishing disability at steps one through four of this process. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

At step one, the ALJ considers whether the claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a)(4)(i). If so, then the claimant is not disabled within the meaning of the Social Security Act.

At step two, the ALJ must determine whether the claimant has any impairments, singly or in combination, that qualify as severe under the regulations. 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the ALJ finds that the claimant does have one or more severe impairments, the ALJ will proceed to step three.

At step three the ALJ compares the claimant's impairments to the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii). If the ALJ finds at step three that the claimant's impairments meet or equal the criteria of a listed impairment, then the claimant is considered disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii).

If the ALJ proceeds beyond step three, she must assess the claimant's residual functional capacity. The claimant's residual functional capacity is an assessment of the work-related physical and mental activities the claimant can still do on a regular and continuing basis despite his limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a); Social Security Ruling (SSR) 96-8p. The assessment of a claimant's residual functional capacity is a critical part of steps four and five of the sequential evaluation processes.

At step four, the ALJ considers whether the claimant retains the residual functional capacity to perform his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv). If the claimant establishes an inability to

4

engage in past work, the burden shifts to the Commissioner at step five to establish that the claimant can perform other work that exists in significant numbers in the national economy, taking into consideration claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(4)(v). The ALJ may satisfy this burden through the testimony of a vocational expert or by referring to the Medical-Vocational Guidelines set forth in the regulations at 20 C.F.R. part 404, subpart P, appendix 2. If the ALJ meets this burden, the claimant is not disabled.

## III. <u>Discussion</u>

The ALJ followed the five-step sequential process in evaluating Plaintiff's claim. At step one, the ALJ found Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2023. The ALJ further found that Plaintiff had not engaged in substantial gainful activity since the September 8, 2017 alleged onset date. (Doc. 10, at 106). At step two, the ALJ found that Plaintiff had the following severe impairments: fibromyalgia, cervical degenerative disc disease, sciatica, anxiety, and a personality disorder. (Doc. 10, at 106). At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled any impairment described in the Listing of Impairments, 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. pt. 404, subpt. P, app. 1. (Doc. 10, at 107).

The ALJ then found that Plaintiff had the residual functional capacity to perform a range of medium work as follows:

> [T]he claimant can lift and/or carry up to 25 pounds frequently and 50 pounds occasionally. She can sit, stand and walk throughout an 8-hour workday with normal breaks. The claimant can frequently climb ramps, stairs, ladders, ropes or scaffolds. She can frequently stoop, kneel, crouch or crawl. The claimant can understand, remember and carry out short, simple instructions. She can tolerate occasional interaction with coworkers and members of public. She can appropriately respond to work pressures in a usual work setting and appropriately responds to changes in a routine work setting. She can maintain attention and concentration for routine work for 2-hour segments.

(Doc. 10, at 110). At step four, the ALJ determined that Plaintiff was unable to perform past relevant work as a cashier checker. (Doc. 10, at 115-16). Proceeding to step five, the ALJ concluded there were other jobs existing in significant numbers in the national economy that Plaintiff could perform, including unskilled medium work as a dishwasher, hand packager, or industrial cleaner.  (Doc. 10, at 117).

Plaintiff argues the ALJ's decision is not supported by substantial evidence, and raises five main issues on appeal. First, Plaintiff argues the ALJ erred by not adopting the residual functional capacity determination set forth in an unfavorable ALJ decision denying a prior application for disability benefits. (Doc. 12, at 13-14). Second, Plaintiff argues the ALJ improperly assessed the medical opinion evidence and should have given more weight to the "findings and diagnoses and objective test results" of several treating medical providers. (Doc. 12, at 15). Third,

Plaintiff maintains the ALJ failed to consider the frequency and duration of her treatment as required by Social Security Ruling (SSR) 96-8p, when assessing Plaintiff's residual functional capacity. (Doc. 12, at 24). Fourth, Plaintiff maintains the ALJ did not provide clear and convincing reasons for discounting her subjective testimony. (Doc. 12, at 26-28). Fifth, Plaintiff argues the ALJ erred by failing to incorporate all of her impairments and resulting limitations into a hypothetical question presented to the vocational expert. (Doc. 12, at 28-30).

The Court addresses these arguments in the order set forth below.

### A.      Effect of Prior Final Agency Decision

Before beginning the five-step sequential evaluation process, the ALJ noted that Plaintiff filed a prior application for Title II and Title XVI disability benefits in September 2010, alleging disability since September 3, 2010. (Doc. 10, at 103). On December 12, 2012, a different ALJ issued an unfavorable decision on Plaintiff's prior application. (Doc. 10, at 242-53). The ALJ determined that Plaintiff had the residual functional capacity for a limited range of light work, and found there were other jobs existing in significant numbers in the national economy that Plaintiff could perform, including unskilled light work as a sewing machine operator or office helper, and unskilled sedentary work as a document preparer. (Doc. 10, at 242-53). The Appeals Council denied Plaintiff's request for review, and the ALJ's decision dated December 12, 2012 became the agency's

final decision for purposes of judicial review. (Doc, 10, at 260-62).

Plaintiff argues the ALJ who issued the unfavorable decision on her current application for benefits erred by not adopting the prior ALJ's residual functional capacity determination, which limited her to light work, and instead finding her capable of the greater exertional demands of medium work. Plaintiff maintains this is significant because she reached age 55 in October 2018, placing her in the "advanced age" category for purposes of the Medical Vocational Guidelines at 20 C.F.R., Part 404, Subpart P, Appendix 2. (Doc. 12, at 14). Had the ALJ adopted the prior residual functional capacity finding and limited her to light work, Plaintiff argues Grid Rule 202.06 would direct a finding of disability based on her age, education, and lack of transferable job skills.  20 C.F.R. Part 404, Subpt P, App. 2, § 202.06.

The Ninth Circuit has held that "principles of res judicata apply to administrative decisions, although the doctrine is applied less rigidly to administrative proceedings than to judicial proceedings." *Chavez v. Bowen*, 844 F.2d 691 (9th Cir. 1988). Under *Chavez*, "a final agency decision by an ALJ that a claimant is not disabled gives rise to a presumption that the claimant continues to be disabled after period adjudicated," which applies to subsequent disability claims arising under the same title of the Social Act. Social Security Acquiescence Ruling 97-4(9), 1997 WL 742758 (Dec. 3, 1997) (adopting *Chavez*).

To overcome the general presumption of continuing nondisability arising from a prior decision, "a claimant must prove 'changed circumstances' indicating a greater disability." Acquiescence Ruling 97-4(9), 1997 WL 742758, at *2. See also *Chavez*, 844 F.2d at 69. Examples of changed circumstances include evidence of an impairment not previously considered, an increase in the severity of an impairment, or a change in the claimant's age category. Acquiescence Ruling 77-4(9), 1997 WL 742758, at *3. See also *Lester v. Chater*, 81 F.3d 821, 827-28 (9th Cir. 1995).

Even when the claimant rebuts the general presumption of continuing nondisability by showing changed circumstances, the specific findings of the prior decision are entitled to some res judicata effect. Acquiescence Ruling 97-4(9), 1997 WL 742758, at *3. The ALJ must adopt the specific findings of the prior decision, including the residual functional capacity finding, unless there is "new and material evidence" relating to each specific finding, or there has been a change in the law, regulations or rulings affecting the finding. Acquiescence Ruling 97-4(9), 1997 WL 742758, at *3.

Here, the ALJ found that Plaintiff rebutted the general presumption of continuing nondisability because she submitted new evidence showing in increase in the severity of her mental impairments in the seven years since the prior ALJ's decision. (Doc. 10, at 103). Plaintiff does not challenge the ALJ's finding of

changed circumstances, but argues the ALJ failed to identify any new and material evidence, or a change in the law or regulations, as required to depart from the prior ALJ's residual functional capacity determination. (Doc. 12, at 8). The Court is not persuaded.

The ALJ did not adopt the residual functional capacity finding in the December 2012 decision "due to new and material evidence as well as changes in the laws and regulations affecting applicable findings." (Doc. 10, at 103). The ALJ noted that the prior decision evaluated medical evidence through August 2012, and found that "new medical evidence in the file establishes the claimant has less restrictive exertional limitations and postural limitations a well as more restrictive mental limitations than previously identified in the prior decision." (Doc. 10, at 103).

Nearly all of the medical evidence that is part of the administrative record now under review is from the period after August 2012, and post-dates the prior ALJ's decision. (Doc. 10, at 694-1402). With exception of a mental status evaluation from March 2011 and a radiology report from December 2010 (Doc. 10, at 674-701), the ALJ relied entirely on these new medical records and evaluations in adjudicating Plaintiff's current application and assessing her residual functional capacity. (Doc. 10, at 108-124). The Ninth Circuit has held that medical evaluations conducted after a prior adjudication necessarily constitute "new and

material information not presented to the first ALJ." *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1173 (9th Cir. 2008); *Trofimuk v. Comm'r of Soc. Sec.*, 2014 WL 794343, at *5 (E.D. Cal. Feb. 27, 2014) (where the ALJ relies entirely on medical evaluations conducted after a prior adjudication, the ALJ is not required to give the findings from the prior adjudication preclusive effect). In light of this new and material evidence, the ALJ was not required to give preclusive effect to the prior ALJ's residual functional capacity finding.

The ALJ also found that "the revised criteria for evaluating mental impairments" and Social Security Ruling 16-3p regarding the evaluation of subjective symptom testimony are changes in the in the law and regulations that affect the prior ALJ's residual functional capacity finding. (Doc. 103). These regulatory changes also provide a basis for the ALJ's decision not to give preclusive effect to the prior ALJ's residual functional capacity finding. See e.g. *Jessica M. v. Commissioner of Social Security*, 2021 WL 619493, at *6 (D. Ore. Feb. 17, 2021) (finding revised regulations regarding evaluating mental impairments, Revised Med. Criteria for evaluating Mental Disorders, 81 Fed. Rg. 66138 (Sept. 26, 2016) were new regulations for purposes of considering res judicata effect of prior determination of nondisability).

For these reasons, the Court finds the ALJ was not required to give preclusive effect to the prior ALJ's residual functional capacity finding and

properly proceeded through the sequential evaluation process.

### B.    Medical Opinion Evidence

Plaintiff next argues the ALJ erred in weighing and assessing the medical opinion evidence and should have given more weight to the "findings and diagnoses and objective test results" of various treating medical providers. (Doc. 12, at 15-18). For all claims filed after March 27, 2017, the Social Security Administration has amended the rules regarding the evaluation of medical opinion evidence at the administrative level. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017). Because Plaintiff filed her claims for disability benefits in September and November 2017, the amended regulations apply in this case.

Under the new regulations, the ALJ "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017). *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2017). These regulations do away with the traditional hierarchy between treating, examining, and non-examining physicians, and instead direct the ALJ to consider all medical opinions and prior administrative medical findings, and evaluate their persuasiveness using several listed factors. 20 C.F.R. §§ 404.1520c(a), 416.920(a). Those factors include supportability,

consistency, relationship with the claimant, specialization, and "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§ 404.1520c(c), 416.920(c). The two most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), 416.920(a).

The regulations require the ALJ to articulate how persuasive she finds all of the medical opinions and prior administrative medical findings, and set forth specific "articulation requirements" for the ALJ's evaluation of the medical opinion evidence. 20 C.F.R. §§ 404.1520c(b), 416.920(b). When one medical source provides multiple opinions, the ALJ is not required to articulate how she "considered all of the factors for all of the medical opinions" and will instead articulate how she considered those opinions "together in a single analysis using the factors" listed above. 20 C.F.R. §§ 404.1520c(b)(1), 416.920(b)(1). Because supportability and consistency are the most important factors, the ALJ must explain how she considered these factors in the decision. Generally, the ALJ is not required to explain how she considered the remaining factors. 20 C.F.R. §§ 404.1520c(b)(2), 416.920(b)(2). However, when the ALJ finds that two or more medical opinions are equally well-supported and consistent with the record but are not exactly the same, she must articulate how she "considered the other most persuasive factors." 20 C.F.R. §§ 404.1520c(b)(3), 416.920(b)(2).

While the new regulations eliminate the hierarchy between treating, examining, and non-examining medical sources, the ALJ must still provide legally sufficient reasons supported by substantial evidence for finding a medical opinion unpersuasive. *Beason v. Saul*, 2020 WL 606760, *3 (C.D. Cal. Feb. 7, 2020). The "new regulations still require the ALJ to explain his or her reasoning to specifically address how he or she considered the supportability and consistency of the medical opinion." *Brandee M.*, 2021 WL 2781803, at *3 (citing 20 C.F.R. §§ 404.1520c, 416.920c).

Thus, the Court must determine whether the ALJ properly evaluated the medical opinion evidence using the factors set forth above.[1] See e.g., *Ryan L.F. v. Commissioner of Social Security,* 2019 WL 6468560 *3-4 (D. Or. Dec. 12, 2019).

---

[1] For all claims filed prior to March 27, 2017, the Ninth Circuit has repeatedly held that an ALJ must provide clear and convincing reasons supported by substantial evidence for rejecting a treating or examining physician's uncontradicted opinion, and specific and legitimate reasons for rejecting a treating or examining physician's contradicted opinion. See *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017); *Ghanim v. Colvin*, 763 F.3d 1154, 1160-61 (9th Cir. 2014). The Ninth Circuit has not yet addressed whether the new regulations meaningfully change how courts are to review the adequacy of an ALJ's reasoning, and whether an ALJ is still required to provide "clear and convincing" or "specific and legitimate" reasons for rejecting a treating or examining medical source opinion. See e.g. *Sergio L. v. Kijakazi,* 2021 WL 549441, at * 5 (C.D. Cal. Nov. 22, 2021); *Brandee M. v. Saul*, 2021 WL 2781803, at *3 (C.D. Cal. July 1, 2021). Even assuming the Ninth Circuit standard still applies, as Plaintiff seemingly argues (Doc. 12, at 18-21), the ALJ's analysis is sufficient for the reasons discussed below.

1.      Dr. Kevin Chin

Dr. Kevin Chin has been Plaintiff's primary care provider for several years. (Doc. 10, at 814-839, 1082-1099, 1156-1177). Although it is not entirely clear, Plaintiff apparently takes the position that the ALJ erred by not giving more weight to Dr. Chin's treatment notes from two appointments, one in April 2018 and the other in February 2020. (Doc. 10, at 17-18).

Treatment notes generally do not constitute medical opinions the ALJ must weigh. Treatment notes must include opinions regarding Plaintiff's limitations or ability to work to be considered a medical opinion. *See* 20 C.F.R. § 416.913(a)(2) and 20 C.F.R. § 4041513(a)(2) ("A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in your work-related abilities.).

Plaintiff first cites Dr. Chin's treatment notes from an April 26, 2018 appointment, which reflect that he had diagnosed her with intermittent explosive disorder, vertigo, and "intractable migraine without status migrainosus, unspecified migraine type." (Doc. 12, at 17, citing Doc. 10, at 1085-88). Plaintiff does not explain the significance of this particular treatment note, or articulate any meaningful argument as to how the ALJ allegedly erred. Plaintiff has the burden of showing that her impairments significantly impact her ability to work, and the ALJ

15

is not required to find that every diagnosis identified in the record is a severe impairment. See e.g. *Langdon v. Berryhill*, 2017 WL 3188616, at *2 (W.D. Wash. July 26, 2017). Nor is the ALJ required to discuss every treatment note in the record. See *Schmitz v. Saul*, 857 Fed. Appx 368 (9th Cir. May 21, 2021) (citing *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984)).

Although Plaintiff fails to further develop her argument pertaining to these particular treatment notes, the Commissioner notes that Dr. Chin observed during this appointment that "the last time [Plaintiff] worked at walmart was on 9/15/17 and has not been able to work since then due to dizziness/[vertigo] and [migraine]." (Doc. 10, at 1087). To the extent this statement constitutes a medical opinion, the ALJ specifically addressed it in her decision. The ALJ found that "the opinion of Dr. Chin regarding [Plaintiff's] inability to work due to impairments is very unpersuasive because this is not supported by his own physical examination findings." (Doc. 10, at 115). The ALJ linked her statement to specific evidence in the record, noting that between November 2017 and January 2020, he found Plaintiff to have no abnormalities of her neurological system or extremities. (Doc. 10, at 115). Consistent with the ALJ's reasoning, Dr. Chin's physical examination findings during this period were unremarkable. (Doc. 10, at 815-16, 820, 1087, 1161, 1165, 1175). The ALJ adequately explained why she found Dr. Chin's

opinion unpersuasive, and Plaintiff has not established that the ALJ erred by not specifically addressing other portions of these treatment notes.

Plaintiff also cites Dr. Chin's treatment notes from a February 18, 2020 office visit, which reflect that her diagnoses at that time included bipolar affective disorder, current episode mixed, without psychotic features; vertigo; and endometrial cancer. (Doc. 12, at 18, citing Doc. 10, at 1156-58). Plaintiff does not explain why she believes the ALJ was required to specifically address these particular treatment notes, which do not contain any opinions regarding Plaintiff's functional limitations. Because these treatment notes offer no opinion about the severity of Plaintiff's impairments and do not identify any associated functional limitations, they are not medical opinions that the ALJ was required to address in her disability determination. See 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1); *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223–24 (9th Cir. 2010).

2.   <u>Dr. Susan Day</u>

On April 13, 2018, licensed clinical psychologist Dr. Susan Day performed a mental status examination during which she observed Plaintiff was cognitively intact and did not exhibit any memory, attention, or concentration problems. (Doc. 10, at 975-77). Dr. Day  estimated that Plaintiff's intellectual functioning was at least in the average range based on her education and work history. (Doc. 10, at 976). Dr. Day found that Plaintiff "may have symptoms associated with

17

Unspecified Anxiety Disorder and possibly some features of Unspecified Personality Disorder," but "there was no evidence that [Plaintiff] would be unable to engage in work-related activity" due to psychological factors. (Doc. 10, at 977).

Plaintiff mentions this report, stating that Dr. Day diagnosed her with unspecified anxiety disorder and unspecified personality disorder, but does not articulate any reason why the ALJ's evaluation of Dr. Day's opinion might have been erroneous. The ALJ found Dr. Day's opinion "very persuasive" because it was supported by her own mental status examination findings, as well as mental status examination findings by Plaintiff's treating registered nurse practitioner, Kim Petersen. (Doc. 10, at 114). Plaintiff has not shown that the ALJ erred by finding Dr. Day's opinion persuasive.

> 3.    Kim Petersen, APRN

Plaintiff argues the ALJ erred by discounting an April 14, 2020 letter submitted by Kim Petersen, APRN, who has been Plaintiff's treating psychiatric care provider since 2015.[2] (Doc. 10, at 1401-02). APRN Petersen stated that Plaintiff's diagnosis of "Bipolar II Disorder and PTSD [were] likely contributing to

---

[2] The revised regulations expanded the list of "acceptable medical sources" who can provide objective medical evidence to establish the existence of a medical impairment to include licensed advanced practice registered nurses. 20 C.F.R. § 404.1502(a), 416.902(a). As a licensed advanced practice registered nurse, Petersen thus qualifies as an acceptable medical source.

her impairment in functioning," but it was "the diagnosis of Somatic Symptoms and related disorders which is the most debilitating of her diagnoses." (Doc. 10, at 1401). APRN Petersen explained that Plaintiff demonstrated "a pervasive pattern of high anxiety and preoccupation with benign physical symptoms," but "is not consciously aware her bodily symptoms are not always attributed to a serious medical disorder." (Doc. 10, at 1401). APRN Petersen indicated that Plaintiff's "symptoms include weakness, fainting spells, dizziness, nausea, tinnitus, insomnia, headaches and tremors," but "no medical diagnosis can explain the degree of impairment she perceives." (Doc. 10, at 1401). APRN Petersen acknowledged that Plaintiff "can objectively appear competent and capable for short periods of time," but stated she was "in favor of [Plaintiff] receiving disability benefits," which would "give her a financial safety net in which to devote time to receiving intensive treatment and rehabilitation." (Doc. 10, at 1402).

The ALJ considered APRN Petersen's opinion and found it unpersuasive for three reasons. First, to the extent APRN Petersen indicated that Plaintiff was unable to work due to her impairments, the ALJ properly pointed out that a statement by a medical source that a claimant is unable to work is an opinion on an issue reserved to the Commissioner and is not a medical opinion. 20 C.FR. §§ 404.1527(d), 416.927(d). But the fact that a medical opinion addresses an issue reserved to the Commissioner is not by itself a reason for rejecting that opinion.

See *Holohan v. Massanari*, 246 F.3d 1195, 1202-03 (9th Cir. 2001). The ALJ is still required to "consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner." Social Security Ruling (SSR) 95-5p, 1996 WL 374183, at *2 (July 2, 1996).

The ALJ provided two more reasons for discounting APRN Petersen's opinion, both of which are supported by substantial evidence. First, the ALJ found that APRN Petersen's opinion regarding Plaintiff's inability to engage in work activity was "vague and conclusory without specifying function-by-function mental limitations in a work setting." (Doc. 10, at 114). Under the applicable regulations, "[a] medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more limitations and restrictions" in performing specific workplace activities. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2). As the ALJ correctly observed, APRN Petersen did not identify any specific physical or mental functional limitations, or describe how Plaintiff's symptoms would translate into specific functional limitations. The ALJ legitimately found APRN Petersen's opinion unpersuasive in part because she did not identify any specific functional limitations. See e.g. *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995) (holding that an ALJ may reject a medical opinion that does not identify any specific functional limitations); *Gerde v. Berryhill*, 2018 WL 2193194, at *3 (W.D. Wash. May 14, 2018) (recognizing that "[t]he lack of

specificity as to functional limitations is a legitimate reason to discount a medical opinion").

Second, the ALJ gave little weight to APRN Petersen's opinion because it was not supported by, or consistent with, her own mental and physical examination findings. (Doc. 10, at 1114). See *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (explaining that inconsistency with medical records qualifies as a legitimate reason to discount a treating medical source opinion). In particular, the ALJ noted that between February 2017 and January 2020, APRN Petersen's examination findings reflected that Plaintiff was typically alert, oriented and cooperative with a normal speech pattern; had intact memory, concentration, and language skills; possessed an average fund of knowledge; and had normal muscle strength and muscle tone with a normal unassisted gait. (Doc. 10, at 114, 782, 787, 843, 849, 855, 991, 996, 1003, 1010, 1260, 1264, 1270-71, 1277-78, 1284-85, 1290-91, 1296-97. 1302-03, 1309, 1315). While APRN Peterson's notes also reflect that Plaintiff was often anxious, and sometimes presented with a sad, depressed, angry, or irritable mood (See e.g. Doc. 10, at 774, 843, 849, 855, 939, 1003), the ALJ reasonably found the fact that her examination findings were otherwise typically unremarkable was not consistent with APRN Petersen's opinion that Plaintiff would not be able to work.

Notably, Plaintiff does not specifically challenge any of the reasons provided by the ALJ for finding APRN Petersen's opinion unpersuasive. As discussed above, the Court finds the ALJ adequately explained how she considered the supportability and consistency factors, and her explanation as to why she found Petersen's opinion unpersuasive is supported by substantial evidence.

4.     Dr. Kathleen Evans

On April 28, 2018, Dr. Kathleen Evans performed a consultative physical examination of Plaintiff. (Doc. 10, at 979-984). Dr. Evans found that Plaintiff had full motor strength and a normal range of motion of the bilateral extremities, with a normal unassisted gait. (Doc. 10, at 981-84). Dr. Evans further found that Plaintiff had a normal range of motion of the neck and only minimal motion limitations of the lumbar spine. (Doc. 10, at 983-84). She made "no findings during exam" of dizziness versus vertigo, noticed no significant issues on rising from a sitting position, and found that Plaintiff "was really quite flexible" with no muscle spasm noted, intact strength, and while there was "a history of herniation," there was "no evidence of radiculopathy." (Doc. 10, at 984).

The ALJ considered Dr. Evans' report, and found that although she did not provide an opinion as to Plaintiff's functional limitations, the physical examination

findings described above supported Plaintiff's residual functional capacity for a range of medium work. (Doc. 10, at 115).

Plaintiff mentions Dr. Evans' evaluation in her supporting brief, and notes that Dr. Evans also found it "difficult to elicit deep tendon reflexes" and observed that an x-ray showed "significant lumbar lordosis." (Doc. 12, at 17, citing Doc. 10, at 981, 984). Plaintiff seems to suggest that the ALJ should have given more weight to these particular notations, and erred by interpreting Dr. Evans' physical examination findings as supporting the residual functional capacity assessment.

Where the evidence is susceptible to more than one rational interpretation, one of the which supports the ALJ's decision, the ALJ's conclusion must be upheld. See e.g. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). The ALJ reasonably interpreted Dr. Evans' report, which documented mostly normal physical examination findings, and her evaluation of Dr. Evans' findings is supported by substantial evidence.

5.   <u>Jimmie Barnwell, PA</u>

On January 23, 2019, physician assistant Jimmie Barnwell performed a consultative physical examination of Plaintiff.[3] (Doc. 10, at 1100-1106). Plaintiff

---

[3] Under the revised regulations, physician assistants like Barnwell are included in the list of "acceptable medical sources" who can provide objective medical evidence to establish the existence of a medical impairment. 20 C.F.R. § 404.1502(a), 416.902(a).

cites portions of PA Barnwell's report, including the fact he listed her diagnoses as
including fibromyalgia, low back pain, and neck pain with foramina stenosis at C6-
7, and PA Barnwell's reference to an MRI that showed "foraminal narrowing at
C6-7 on the left without radicular complaints." (Doc. 12, at 17). Although she does
not expressly say so, Plaintiff apparently maintains that PA Barnwell's findings
support a more restrictive limitations than those set forth in the ALJ's residual
functional capacity finding.

As the ALJ correctly observed, however, PA Barnwell also found that
Plaintiff had full motor strength and a full range of motion of the spine and all
extremities. (Doc. 10, at 111, 1102-1103). PA Barnwell further found that Plaintiff
had a normal gait, and found "no restrictions related to the patient's ability to
stand, walk or sit." (Doc. 10, at 1105-06). The ALJ found PA Barnwell's opinion
very persuasive because it was supported by his own physical examination
findings, which were largely normal and unremarkable. (Doc. 10, at 115). Plaintiff
has not shown that the ALJ erred in finding PA Barnwell's opinion persuasive, and
her assessment is supported by substantial evidence.

6.   Dr. Mark Mozer

Finally, Plaintiff mentions a mental status evaluation conducted by Dr. Mark
Mozer on March 19, 2019. Plaintiff notes that Dr. Mozer identified a diagnosis of

borderline personality disorder, and observed that Plaintiff was probably volatile and difficult to get along with. (Doc. 12, at 17, 1114). Again, although she does not expressly say so, Plaintiff apparently maintains that Dr. Mozer's findings support a more restrictive limitations than those set forth in the ALJ's residual functional capacity finding.

As the ALJ correctly noted, however, Dr. Mozer ultimately opined that Plaintiff was capable of unskilled work activity, but should probably avoid stressful jobs. (Doc. 10, at 114, 1114). The ALJ found that Dr. Mozer's opinion concerning her ability to work at the unskilled level with difficulties getting along with others persuasive, and limited Plaintiff accordingly to unskilled work with only occasional interaction with coworkers and members of the public. (Doc. 10, at 110, 114). Plaintiff has not shown that the ALJ erred in finding Dr. Mozer's opinion persuasive, and her assessment is supported by substantial evidence.

### C.   Subjective Symptom Testimony

Plaintiff argues the ALJ failed to provide clear and convincing reasons for discounting her subjective testimony as to the severity of her symptoms and limitations. (Doc. 12, at 26-28).

The ALJ must follow a two-step process when evaluating a claimant's subjective symptom testimony. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). At step one, "the ALJ must determine whether the claimant has

presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter*, 504 F.3d at 1036. If the claimant meets this initial burden, at step two the ALJ may discredit the claimant's subjective symptom testimony about the severity of her symptoms "only by offering specific, clear and convincing reasons for doing so." *Lingenfelter*, 504 F.3d at 1036.

Here, the ALJ found Plaintiff met her initial burden because she produced evidence of medically determinable impairments that could reasonably be expected to cause her alleged symptoms. The ALJ then found that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the medical and other evidence in the record. (Doc. 10 at 112).

At her administrative hearing, Plaintiff testified that she is always dizzy (Doc. 10, at 134), and has difficulty remembering things (Doc. 10, at 136). She stated that she a hard time cooking because she is always shaking (Doc. 10, at 138), does limited grocery shopping, and does laundry but it takes her a week to finish folding the clothes. (Doc. 10, at 139). Plaintiff testified that she is nauseated 99 percent of the time (Doc. 10, at 140) and suffers from fatigue that prevents her from working (Doc. 10, at 140-42). Plaintiff explained that she has problems with anger, and gets headaches on a daily basis that often result in her having to lie

down (Doc. 10, at 142-43). Plaintiff also completed two function reports dated January 19, 2018 and December 7, 2018, on which she described suffering from a debilitating combination of depression, anger issues, fatigue, dizziness, nausea, pain, and memory loss. (Doc. 10, at 525-56, 608-15).

The ALJ summarized Plaintiff's subjective testimony, but discredited her statements as to the severity of her symptoms and limitations for three reasons, two of which are related.  (Doc. 10, at 111). First, the ALJ found that Plaintiff's complaints were not consistent with the objective medical evidence. (Doc. 10, at 111). Specifically, the ALJ reasonably found that the consistently normal physical examination findings described above by APRN Petersen, Dr. Evans, PA Barnwell, and Dr. Smith were not consistent with Plaintiff's testimony as to the severity of her physical symptoms, including debilitating fatigue, nausea, headaches, and dizziness. The ALJ also cited the many normal mental status examination findings by ARPN Petersen and Dr. Day, and permissibly found they were not consistent with Plaintiff's testimony as to the severity of her mental symptoms, including memory loss.  See *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects."); *Carmickle v. Commissioner, Social Sec. Admin.*, 533

F.3d 1155, 1161(9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for the rejecting the claimant's subjective testimony.")

The ALJ also discounted Plaintiff's testimony based on her daily activities, and found that Plaintiff's statements to her medical providers during the relevant period reflected a higher level of activity than she claimed she was capable of on a daily basis. (Doc. 10, at 111). In doing so, the ALJ referenced the evidence she had discussed previously in her decision at step three. (Doc. 10, at 111, 112).  In her step three analysis, the ALJ cited treatment notes reflecting that Plaintiff told various medical providers that she was able to care for her children, go hiking, care for pets, prepare meals, perform household chores, drive, handle her personal care, work on art projects, play games, and attend birthday parties. (Doc. 10, at 110). For example, the treatment notes cited by the ALJ reflect that in February 2018, Plaintiff reported having difficulty making weekly meetings "due to being too busy," and "discussed hiking and hobbies," including "pet snakes she has bought and found while hiking." (Doc. 10, at 110, 889). In June 2018, Plaintiff described taking care of her grandson (Doc. 10, at 1034), and reported to Dr. Mozer in March 2019 that she keeps a clean house, cooks well, and does her own shopping." (Doc. 10, at 1113).

The Court does not agree with the ALJ's statement that such evidence demonstrates Plaintiff was engaged in "robust" daily activities during the relevant

period. (Doc. 10, at 111). Nevertheless, the ALJ reasonably found that Plaintiff's statements to her medical providers were not always consistent with her testimony that she was constantly dizzy and nauseated, and had difficulty cooking and completing household chores. See e.g. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (holding that an ALJ can consider a claimant's ability to perform daily activities when assessing subjective symptom testimony).

Ultimately, the Court finds that the ALJ reasonably explained how the medical records and Plaintiff's activities contradicted her testimony. The Court may not substitute its own, or the Plaintiff's, interpretation of the evidence for the ALJ's reasonable interpretation. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th. Cir. 2002). See also *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995) (Even if the record is "susceptible to more than one rational interpretation," if the ALJ's decision is supported by substantial evidence it must be upheld."). Therefore, the Court concludes the ALJ provided clear and convincing reasons, supported by substantial evidence in the record, for partially discounting Plaintiff's testimony as to the extent of her symptoms and limitations.

### D.    Frequency and Duration of Medical Treatment

Plaintiff argues the ALJ erred in assessing her residual functional capacity because she failed to consider and discuss the effects of her medical treatment, including specifically the frequency of her medical appointments, as required by

Social Security Ruling (SSR) 96-8p.

SSR 96-8p provides that a residual functional capacity "is an assessment of a claimant's ability to do sustained work-related activities in a work setting on a regular and continuing basis." SSR 96-8p,1996 WL 374184, at *1 (July 2, 1996). "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p,1996 WL 374184, at *1. SSR 96-8p further directs that the residual functional capacity assessment must be based on all of the relevant evidence, including "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)." SSR 96-8p,1996 WL 374184, at *5 (July 2, 1996).

The ALJ's failure to consider the effects of treatment, including the frequency of medical appointments, may constitute reversible error. See *Jones v. Kijakazi*, 2022 WL 595729, at *4 (D. Mont. Feb. 28, 2022); *Smither v. Kijakazi*, 2022 WL 522622, at *6 (D. Mont. Feb. 22, 2022); *Childs v. Kijakazi*, 2022 WL 325913, at *8 (D. Mont. Feb. 3, 2022); *Edmunds v. Kijakazi*, 2021 WL 4452762, at *6 (D. Mont. Sept. 29, 2021); *Esman v. Kijakazi*, 2021 WL 5083842, at *7 (D. Mont. Nov. 2, 2021); *Bourcier v. Saul*, 856 Fed. Appx. 687, 691 (9th Cir. 2021).

Plaintiff has culled through her medical records and calculated the number medical appointments she attended between her alleged onset date in September

2017 and March 2020. As Plaintiff tallies it up, she had 15 appointments between September 2017 and December 2017 for an average of 3.75 per month, 34 appointments in 2018 for an average of 2.83 per month, 26 appointments in 2019 for an average of 2.16 per month, and six appointments during the first three months of 2020 for an average of two per month. (Doc. 12, at 9). Based on these calculations, Plaintiff claims she attended an average of 2.6 medical appointments per month during the relevant timeframe, and argues the ALJ erred by failing to consider whether the frequency of her medical appointments would interfere with her ability to work on a regular and continuing basis.

In *Bourcier*, an unpublished decision, the Ninth Circuit held without discussion that because the claimant had "had presented evidence sufficient to establish the possibility that the frequency of her medical appointments may inhibit her ability to work on a 'regular and continuing basis," the case was properly remanded "for further consideration and development of the record on this issue." *Bourcier*, 856 Fed. Appx. at 691. The Ninth Circuit instructed that on remand, "[t]he ALJ should consider, for example, the need to schedule all appointments during the workweek or workday, the need to miss an entire workday for each appointment, and whether the need for this number of appointments is ongoing." *Bourcier*, 856 Fed. Appx. at 691.

Here, the ALJ discussed Plaintiff's medical records at length, but did not

consider whether the effects of her treatment, particularly the frequency of her medical appointments, could potentially interfere with her ability to work on a regular and continuing basis. As the spate of recent decisions out of this district in the wake of the Ninth Circuit's unpublished decision in *Bourcier* reflect, this was arguably error. See e.g. *Jones*, 2022 WL 595729, at \*4; *Smither*, 2022 WL 522622, at \*6; *Childs,* 2022 WL 325913, at \*8; *Edmunds*, 2021 WL 4452762, at \*6; *Esman*, 2021 WL 5083842, at \*7.

But even assuming the ALJ erred, Plaintiff has not met her burden of demonstrating that the error in this case was harmful. See e.g. *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009) (the claimant has the burden of demonstrating there are harmful error in the ALJ's decision); *Ludwig v. Astrue*, 681 F.3d 1047, 1054 (9th Cir. 2012) ("The burden is on the party claiming error to demonstrate not only the error, but also that it affected [her] 'substantial rights'."); *McLeod v. Astrue*, 640 F.3d 881, 886087 (9th Cir. 2011) (the claimant has the burden of showing that the ALJ erred and that any error was harmful).

In each of the district court cases cited above, the plaintiff presented the court with similar calculations as to the historical frequency of the claimant's medical appointments. Importantly, the administrative record in each of these cases also contained vocational expert testimony that if an individual were to miss more than a certain number of workdays per month, that individual would be precluded

from all work in the national economy. See *Jones*, 2022 WL 595729, at *4 (vocational expert testified that if an individual were to miss more than two workdays in a typical month on at least an occasional basis, that person would not be able to perform any work in the national economy); *Smither*, 2022 WL 522622, at *6 (same); *Childs,* 2022 WL 325913, at *8 (same); *Esman*, 2021 WL 5083842, at *7 (same); *Edmunds*, 2021 WL 4452762, at *6 (vocational expert testified that if an individual were to miss more than three or four workdays in a typical month, that person would not be able to sustain full-time work). Because the claimant in each of these cases presented evidence that the amount of time needed to attend medical appointments could potentially exceed the threshold for permissible monthly absences identified by the vocational expert, the court in each case held that the ALJ's failure to consider the effects of the frequency of the claimant's medical appointments, constituted harmful and reversible legal error. *Jones*, 2022 WL 595729, at *4; *Smither*, 2022 WL 522622, at *6; *Childs,* 2022 WL 325913, at *8; *Esman*, 2021 WL 5083842, at *7; *Edmunds*, 2021 WL 4452762, at *6.

Here, in contrast, the vocational expert provided no testimony as to the number of monthly absences that would preclude competitive employment. Plaintiff's counsel did not raise this issue during her examination of the vocational expert, focusing instead on Plaintiff's alleged inability to sustain physical activity for a full eight-hour workday. Specifically, Plaintiff's counsel asked the vocational

expert whether an individual who "is unable to sustain physical activity for a full eight-hour shift, and that's even taking into account the 15-minutes breaks, one in the morning and one in the afternoon, and a lunch break," would "be able to perform any full-time, sustained work activity." (Doc. 10, at 152). The vocational expert responded that there "would be no work for such an individual." (Doc. 10, at 152). Plaintiff relies on this portion of the vocational expert's testimony to support her argument that the ALJ's failure to consider the frequency of her medical appointments was prejudicial error. (Doc. 12, at 29). But this testimony was in response to a question about a hypothetical individual's inability to meet the physical demands of an eight-hour workday and corresponding need to take breaks while on the job. The vocational expert offered no testimony as to the allowable number of monthly absences from work. Thus, even assuming the frequency of Plaintiff's medical appointments would result in her being absent from work an average of two days every month, there is no evidence in the record that such an absence rate would preclude competitive employment, and no basis for finding that the ALJ's failure to address the frequency of Plaintiff's medical appointments affected the ultimate non-disability determination. See *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (an ALJ's error is harmless if it does not affect the ultimate non-disability determination).

The Court also notes that Plaintiff does not point to, and the Court has not

found, any medical source opinions in the record stating that Plaintiff would likely be absent from work for any particular number days each month due to her impairments or treatment. In addition, Plaintiff has presented no evidence that she would not be able to schedule and attend her medical appointments around her work schedule, and/or schedule more than one appointment on the same day. See *Goodman v. Berryhill*, 2017 WL 4265685, at *4 (W.D. Wash. Sept. 25, 2017) (finding the claimant's "narrative citation to the frequency of his medical appointments" during the relevant period unpersuasive, as "[n]o physician opined that [the claimant] would frequently miss work due to medical appointments" and "[n]othing suggests that [the claimant] could not have scheduled his medical appointments outside of working hours"). On this record, and absent any testimony by the vocational expert as to the number of monthly absences that would preclude competitive employment, the Court finds that the ALJ's failure to address the frequency of Plaintiff's medical appointments did not affect the ultimately non-disability determination and was, at most, harmless error.

###    E.    Vocational Expert

Plaintiff argues the ALJ erred by failing to incorporate all of her impairments into the hypothetical question presented to the vocational expert. Hypothetical questions posted to the vocational expert must set out all the limitations and restrictions of the claimant. *Embrey v. Bowen,* 849 F.2d 418, 422

(9th Cir.1988). "The testimony of a vocational expert 'is valuable only to the extent that it is supported by medical evidence.'" *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (quoting *Sample v. Schweiker*, 694 F.2d 639, 644 (9th Cir. 1982)). If the assumptions in the hypothetical are not supported by the record, then the vocational expert's testimony that the claimant could perform other work existing in the national economy has no evidentiary value. *Embrey*, 849 F.2d at 422.

As discussed above, the Court has determined the ALJ properly weighed medical evidence and provided sufficient reasons for discounting Plaintiff's testimony. The Court has also determined that any error on the ALJ's part in failing to address the frequency of Plaintiff's medical appointments was harmless. The Court finds that the ALJ was not required to include any additional imitations in the residual functional capacity assessment, which was supported by substantial evidence. See *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (the ALJ need not include limitations not supported by substantial evidence). The ALJ permissibly found based on the vocational expert's testimony that Plaintiff was not disabled at step five of the sequential evaluation process.

## IV.   Conclusion

For the reasons discussed above, the Court concludes the ALJ's decision is based on substantial evidence and free of prejudicial legal error. Accordingly,

IT IS ORDERED that the Commissioner's decision is AFFIRMED.

DATED this 16th day of March, 2022.

_____
Kathleen L. DeSoto
United States Magistrate Judge